UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ANDREW ANANIA

No. 21 CR 633-1

Judge Edmond E. Chang

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully submits this sentencing memorandum with respect to defendant Andrew Anania. For the reasons set forth below, a Guideline sentence of life imprisonment, with a consecutive sentence of seven years, is warranted and sufficient, but not greater than necessary, upon consideration of the relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

## I. Background

On April 18, 2024, the grand jury returned a second superseding indictment charging Anania with kidnapping, in violation of Title 18, United States Code, Section 1201(a)(1) and 2 (Counts 1, 3 and 4); carjacking, in violation of Title 18, United States Code, Section 2119 and 2 (Counts 2 and 5); and using, carrying and brandishing a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c) (Count 6). Dkt. 63. The indictment further alleged that each of the crimes were committed while defendant was on pre-trial release on Case No. 19 CR 532, in violation of Title 18, United States Code, Section 3147. *Id.*

On October 31, 2024, defendant pled guilty to Counts One and Two, pursuant to a plea declaration. Dkt. 101, 102. Defendant proceeded to trial on the remaining counts. Dkt. 139-146. On January 13, 2025, a jury found defendant guilty of Counts 3-6. Dkt. 146. The jury further found that defendant brandished a firearm in the course of violating 18 U.S.C.§ 924(c), and that defendant was on pretrial release at the time of each of the crimes, in violation of 18 U.S.C. § 3147.

Defendant is scheduled to be sentenced by this Court on May 13, 2025. Dkt. 146.

## II. Offense Conduct and Relevant Conduct

### *Pretrial Release*

On June 26, 2019, a grand jury in the Northern District of Illinois approved an indictment charging Andrew Anania with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). 19 CR 532, Dkt. 1.

On July 23, 2020, Anania filed an emergency motion for pretrial release. 19 CR 532, Dkt. 33. On October 23, 2020, over the government's objection, the district court granted Anania's motion for pretrial release. 19 CR 532, Dkt. 39. On October 27, 2020, Judge Coleman ordered Anania placed on home incarceration (19 CR 532, Dkt. 40) and issued an Order Setting Conditions of Release for defendant in 19 CR 532. Government Exhibit 101. The October 27, 2020 Order notified defendant of the potential effect of committing an offense, including federal offenses, while on pre-trial release. *Id.*

Anania was released on October 28, 2020.

On December 18, 2020, January 4, 2021, January 22, 2021, and February 1, 2021, the government moved to revoke defendant's pre-trial release due to violations of his pretrial release conditions. 19 CR 532, Dkt. 52, 54, 55, 57.

On February 2, 2021, Judge Coleman issued a bench warrant for Andrew Anania. 19 CR 532, Dkt. 59. On February 3, 2021, Judge Coleman ordered Anania, via video conference, to report to the United States Marshals by 3:30 p.m. on February 3, 2021. 19 CR 532, Dkt. 61.

Anania told United States Marshals that he would voluntarily surrender. He did not, and he became a fugitive. According to Pretrial Services, the electronic monitoring system provided to Anania was disabled.

Anania remained a fugitive until his arrest on March 13, 2021. Anania was on pretrial release during the time period covered by Counts One through Six.

### *February 23, 2021 – March 10, 2021 Communications Regarding Anania's Possession of Firearms, Including a .357 Pistol and a Gen 5 Glock*

On February 23, 2021, Anania messaged Facebook user "Twofour Hitta," "I got a 357 snub [pistol] n [and a] glock 19." Government Sentencing Exhibit 601-A.

On February 24, 2021, Anania took a video of himself, which he sent to his girlfriend, Individual A. Government Sentencing Exhibit 601-C. In the video, Anania captured his own face (:05) and two guns on his lap. The first gun (:01) is a revolver with a black handle and a silver barrel and cylinder, consistent with a 357 snub-nosed pistol and the gun described by Victim B as being used by Anania during the

kidnapping in Count Three. The second gun (:02) appears to be a Gen 5 Glock semi-automatic with a black slide and an inserted magazine, consistent with the gun described by Victim C as being used by Anania during the kidnapping and carjacking in Counts Four, Five and Six.

At trial, Individual A testified that she had previously testified in the grand jury that Anania carried a revolver with him "all the time," and identified Government Exhibit 604 as a picture of that revolver.

On March 10, 2021, Facebook User A messaged Anania, "I'm tryna buy a [gun emoji]." On March 10, at 1:29 a.m., two hours before the Victim C kidnapping, Anania responded that he had two guns available, a Glock ("glizzy") and a "357." Government Sentencing Exhibit 601-B.

On March 10, 2021, Facebook User B asked Anania, "what generation Glock" he had. At 2:38 a.m., approximately one hour before the Victim C kidnapping, Anania responded that it was a "Gen 5 brand new." Anania said it was a "17 shot" capacity Glock with no scratches on it. Government Sentencing Exhibit 601-E.

### *February 27, 2021 Kidnapping, Carjacking and Sexual Assault*

With respect to Count One of the Second Superseding Indictment, on or about February 27, 2021, at Chicago, defendant Andrew Anania, willfully and unlawfully seized, confined, kidnapped, abducted, and carried away Victim A, and otherwise held her for his own purpose and benefit, including sexual contact, and in committing and in furtherance of the commission of the offense, used a means, facility and

instrumentality of commerce, in violation of Title 18, United States Code, Section 1201(a)(1).

With respect to Count Two, on or about February 27, 2021, at Chicago, defendant Andrew Anania, with intent to cause death and serious bodily harm, took a motor vehicle, namely a 2005 Honda Odyssey, that had been transported, shipped, and received in interstate and foreign commerce, from the person and presence of Victim A, by force, violence and intimidation, in violation of Title 18, United States Code, Section 2119.

On February 27, 2021, Victim A remote-started her car from her residence on the 4700 block of South Laporte Avenue, in Chicago. Government Sentencing Exhibit C at 3-4. When Victim A exited the house, Anania approached her, told her he had a gun, and told her to get into her car (a silver 2005 Honda Odyssey[1], bearing license plate number CA29171 and VIN 5FNRL38725B058430). *Id.*

Defendant told her to drive approximately one block east. When Victim A got to the corner of Laporte and 48th Street, defendant touched her genitals and breasts (over her clothing) and told Victim A that he was going to force her to "suck [his] dick." *Id.*

Defendant instructed Victim A to get out of the car so he could take the steering wheel. At that time, Victim A observed that defendant was not actually holding a gun, but rather a pack of cigarettes that he was pretending was a gun. Victim A saw

---

[1] The silver 2005 Honda Odyssey was manufactured in Lincoln, Alabama.

5

that there was another car at the intersection, screamed for help, got out of the vehicle, and ran back to her home. *Id.*

Defendant stole Victim A's Honda Odyssey and fled the scene. Defendant then crashed the Honda Odyssey into a group of parked vehicles on the 5300 block of South Keeler, Chicago, before fleeing that scene on foot. *Id.*

### *March 8, 2021 Kidnapping and Sexual Assault*

With respect to Count Three of the Second Superseding Indictment, on or about March 8, 2021, at Darien and elsewhere, defendant Andrew Anania, willfully and unlawfully seized, confined, kidnapped, abducted, and carried away Victim B, and otherwise held her for his own purpose and benefit, including sexual abuse, and in committing and in furtherance of the commission of the offense, used a means, facility and instrumentality of commerce, in violation of Title 18, United States Code, Section 1201(a)(1).

On March 8, 2021, Anania went to a Speedway and a Burrito Paradise in Darien, Illinois, asking employees and a customer if they could call a taxi for him. One of the Burrito Paradise employees called an Uber for defendant.

At approximately 6:14 p.m., Victim B, a part-time Uber driver, arrived outside the Burrito Paradise in her GMC Terrain SUV.[2] Government Sentencing Exhibit D at 3:00-8:13.

Anania got in her car. Shortly after the ride began, Anania leaned into the space between the front seats, tapped Victim B on the shoulder and showed her a

---

[2] The GMC Terrain SUV was manufactured in Ingersoll, Ontario, Canada.

gun. Anania said, "here's what we're going to do. You're going to do everything I tell you to do. You're going to drive me to Ogilvie Train Station." He pointed the gun towards Victim B and the steering wheel. Victim B said Anania could put the gun away, and that she would do everything he told her to do. *Id.* at 10:38- 12:26. Anania instructed Victim B to turn off her Uber app. *Id.* at 12:26-12:58; 13:42-14:40.

While they were driving on Route 83, Anania began making comments about Victim B's appearance, saying that he was attracted to her. Anania asked if she wanted to "make some good money" and told her that he had "stacks" of money that he would give her. Victim B told him that she was not interested. As they were driving on I-55, Anania said, "I can make you do anything I want you to do." Victim B said, "you've got the wrong person. I won't do just anything." Anania repeated, "Yes, I can make you do anything." *Id.*, 15:16-20:30.

Anania demanded Victim B's purse, which Victim B gave him. Victim B saw in the rear-view mirror that Anania was looking through the purse. Anania started calling Victim B by name and told her that he knew where she lived. *Id.*, 20:30-22:13.

While they were driving on I-55, Anania climbed into the front passenger seat of the car. Once he was in the front seat, Anania began touching Victim B's breasts and the inner part of her right leg. Victim B said she was uncomfortable. *Id.*, 22:13-24:05.

Anania pulled down his pants, exposing his erect penis, and demanded that Victim B rub his penis with her hand while she was driving on the highway. Victim B followed Anania's instructions. Victim B then told Anania she wanted to have both

hands on the wheel while driving and put her hands back on the wheel. Anania instructed Victim B to get off the highway. *Id.*, 24:05-25:25.

When they got off the highway, Anania brought the gun back out. *Id.*, 27:50-28:00; 28:20-28:40. Anania instructed Victim B drive to an alley between the 7400 West Blocks of 56th Street and 56th Place in Summit, Illinois. *Id.*, 25:25-27:00.

Once the car was parked, Anania pulled down his pants, showed Victim B his erect penis and demanded oral sex. Anania also demanded that Victim B remove her shirt. Victim B followed Anania's instructions. *Id.*, 27:00-29:30. Shortly after Victim B began performing oral sex, Anania told her to stop because a person walked out into the alley. *Id.*, 29:30-30:30.

Anania instructed Victim B to drive to a second alley, on the 4100 block of Maple Avenue in Stickney, Illinois. *Id.*, 31:50-32:25. Anania told Victim B to shut off the car lights, get in the backseat, and give him the keys. *Id.*, 32:25-33:10.

Anania walked around the car, holding the gun, and opened the rear driver's side door. Anania then instructed Victim B to get out of the car. Anania instructed Victim B to pull down her pants and bend over the rear seat of the car. Victim B followed Anania's instructions. Anania told Victim B to get on all fours in the backseat, which she did. Anania then penetrated Victim B's vagina with his penis. *Id.*, 33:10- 34:53.

After approximately two minutes, Anania instructed Victim B to sit on his lap for continued intercourse. After a couple minutes, Victim B got up. Anania grabbed

her neck and pushed her down to give him oral sex. Anania ejaculated. Victim B spat out Anania's ejaculate in disgust. *Id.*, 34:53-38:15.

Anania pulled up his pants and told Victim B to stay in the back seat. Anania walked to the passenger side door, holding the gun. Anania got in the car, then told Victim B to get in the driver seat and start the car. 3.14 Interview, 34:53-38:15.

Anania instructed Victim B to drive him to Chicago. During the drive, Anania said that in this area they had to be careful of the [Latin] Kings. Anania said that he was a member of the Two Six gang[3]. *Id.*, 38:15-44:42. Anania used a bottle of hand sanitizer and anti-bacterial wipes to wipe down the radio, the passenger-side door, and Victim B's purse. Anania gave Victim B a wipe and told her to wipe down her genitals. Victim B put a wipe down her pants and mimicked wiping her genitals, but did not actually wipe her genitals (to preserve any evidence of the rape). Anania threw the wipes out the window. *Id.* 44:42-47:44.

Anania told Victim B that he knew she had a credit card and that she would have to stop at a bank and pull out money. Victim B told Anania that her credit cards were maxed out. Victim B told Anania that there were $6 in a compartment in the car. Victim B reached into the compartment and pulled out $6. Anania took the $6 and put it in his pocket. *Id.* 47:44-48:33. Anania instructed Victim B not to watch him when he got out, to keep her head down, and to drive away. Anania then got out of the car and fled.

---

[3] Anania admits that he is actually a member of the Latin Kings. This was said to conceal his identity.

That night, Victim B was treated at Mount Sinai Hospital, where the treating nurse administered a rape kit and observed vaginal bruising and redness, a tear in the Victim B's hymen and oral scratching and redness. Government Exhibit 325.

### *March 10, 2021 Kidnapping and Carjacking*

With respect to Count Four of the Second Superseding Indictment, on or about March 10, 2021, at Cicero, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant willfully and unlawfully seized, confined, kidnapped, abducted, and carried away Victim C, and otherwise held her for his own purpose and benefit, and in committing and in furtherance of the commission of the offense, used a means, facility, and instrumentality of interstate commerce; in violation of Title 18 United States Code, Sections 1201(a)(1) and 2.

With respect to Count Five of the Second Superseding Indictment, on or about March 10, 2021, at Cicero, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, with intent to cause death and serious bodily harm, took a motor vehicle, namely a 2020 Chevrolet Blazer, that had been transported, shipped, and received in interstate and foreign commerce, from the person and presence of Victim C, by force, violence, and intimidation; in violation of Title 18 United States Code, Sections 2119 and 2.

With respect to Count Six, on or about March 10, 2021, at Cicero, Northern District of Illinois, Eastern Division, and elsewhere, defendant Andrew Anania, did use, carry and brandish a firearm during and in relation to a crime of violence for

which he may be prosecuted in a court of the United States, namely the carjacking of Victim C; in violation of Title 18, United States Code, Section 924(c)(1)(A).

More specifically, on March 10, 2021, at approximately 3:44 a.m., Victim C remote-started her Chevy Blazer[4] and then walked out of her home on the 5100 block of West 25th Place in Cicero, Illinois. Exhibit A at 1. Two men, subsequently identified as Andrew Anania and Walter Moran, approached Victim C and asked her for the time. Victim C responded, then got in her car and locked the door. The two men approached the car and stood at the front driver and passenger door. Government Sentencing Exhibit B, at 7:53.

Anania walked to the driver door, pointed a black pistol through the window at Victim C and said, "open the door." Government Sentencing Exhibit A at 1; Government Sentencing Exhibit B at 7:54. Victim C, afraid, unlocked the car doors. Exhibit A. Anania instructed her to move over, which she did. Moran opened the front passenger side door, but then Anania instructed him to get in the back seat, which he did. Anania told Victim C not to try anything. *Id.*

Anania instructed Victim C to give Moran her watch and purse, which she did. Government Sentencing Exhibit B at 8:03. The purse contained approximately $200 in cash, as well as credit and debit cards. *Id.* at 8:05.

Anania and Moran drove to the vicinity of the intersection of South Washtenaw Avenue and West 23rd Place in Chicago. Government Sentencing Exhibit A, at 2. Two pedestrians shot at Victim C's Blazer. Moran returned fire, shooting approximately

---

[4] Manufactured in Mexico.

three times from the back seat of Victim C's car. *Id.*

Around this time, Victim C began crying. Government Sentencing Exhibit B, at 8:14-8:15. Anania told her to calm down, or he would shoot her. *Id.*

Anania drove Victim C to an empty forest preserve in Hodgkins Village, where Anania got out to urinate. *Id.* During the drive, Anania took Victim C's phone and threw it out the window. *Id.*

Anania drove back to Interstate 55, travelling north and exiting on Harlem. When Anania was approximately four blocks from the second alley he had taken Victim B to during her kidnapping the night prior, Anania asked Moran what they should do with Victim C. Moran said they should drop off Victim C, who was crying. They dropped off Victim C around Harlem and 47th Street, instructing her not to call the police and not to look back. Anania and Moran then fled in Victim C's Chevy Blazer. Victim C hid and then walked to a nearby Dunkin Donuts, where she asked someone to call the police. *Id.*

At trial, Victim C testified that she works in quality control at a company which manufactures components of firearms. Victim C testified that she looks at gun parts every day as part of her job, and testified that Anania (the front seat kidnapper) was holding a real gun because it had slots on the slide, similar to the rails she had inspected at her job.

### *March 10, 2021 Flight From Police*

On March 10, 2021, at approximately 6:05 a.m., Cicero Police Officers responded to 6705 W. Cermak, to investigate reports from OnStar tracking Victim C's stolen vehicle. Government Sentencing Exhibit E.

One officer tried to pull over defendant, which defendant ignored. A second officer then tried to pull over defendant. Defendant took off at a high rate of speed, in excess of 80 miles per hour down Cermak Road and Harlem Road. *Id.*

OnStar disabled the vehicle. Defendant fled from the vehicle on foot, ran through an alley, and jumped headfirst over a fence into a residential backyard, successfully eluding arrest at that time. *Id.*

### *March 10, 2021 Sale of Glock Used in Victim C Kidnapping*

On March 10, starting at approximately 12:00 p.m. (about six hours after Anania escaped the Cicero Police), Anania engaged in a series of Facebook messages with Facebook User B, regarding his sale of "the glock," the gun Anania had used in the kidnapping of Victim C. Government Sentencing Exhibit 601-H. At 1:18 p.m., Anania instructed Facebook User B to have his customer "slide" to an address next to Anania's parents' home. At 2:37 p.m., Facebook User B told Anania that his customer was arriving to pick up the gun. Anania responded by asking what kind of car ("whip") the customer was driving.

### *March 10-13, 2021 Defendant's Collection of Information About Victim B and Family*

An extraction of records from defendant's cell phone shows that between March 10, 2021 (when he activated cellular data for the phone) and March 13, 2021 (when

he was arrested), defendant conducted extensive research into the one eyewitness of his March 8th kidnapping and sexual assault: Victim B.

Defendant conducted a Google search for Victim B (Exhibit 504A-10), went to her LinkedIn page (504F-14), accessed her public records (504F-11), reviewed dozens of her photographs on Instagram and Facebook (504-E1 and 504-E2), searched Google and Google Images for her home address (504A-13 and 504A-12), went to a GoFundMe page Victim B created (504F-13), searched her boyfriend on Google and Facebook (504F-12 and 504A-9), and searched her sister on Google (504A-11).

Defendant had an unknown third-party request Victim B as a Facebook friend and send him a screenshot of her Facebook profile (504B-1). That same unknown person sent defendant a screenshot from Victim B's mother's Facebook page, identifying Victim B's family members (504B-2).

Defendant used these sources to create a handwritten note (504C), containing information on Victim B, including the names of her family members, where she lived, and where she worked. On March 13, 2021, Defendant took a photograph of these notes with his phone, at a time he knew U.S. Marshals were outside the building he was in *(see* Government Sentencing Exhibit F), minutes before he surrendered.

### ***Defendant's Obstruction of Justice Through Trial Testimony***

Defendant took the stand during the course of his trial on Counts Three through Six and took an oath to tell the truth. Most of defendant's subsequent statements constituted perjury. Those false statements fall into two major groups: 1) defendant's statements regarding his March 8, 2021 actions towards Victim B; and

2) defendant's statements regarding how he obtained Victim C's stolen car on March 10, 2021, including his denial of being present for Victim C's kidnapping and carjacking.

With respect to Victim B, defendant falsely claimed that Victim B had lied about what occurred in her car on March 8. Defendant falsely denied pulling a gun on Victim B, threatening her with the gun, and sexually assaulting her multiple times against her will. Defendant concocted a story that he and Victim B went to go buy weed together, then had sex as part of some romantic fling. Defendant claimed that Victim B later brought charges against defendant because he didn't pay her the $100 he offered her to drive him to Ogilvie. Anania's story was not credible and the jury's verdict reflects their finding that the testimony was not credible.

With respect to Victim C, defendant falsely denied his identity as the man in the front seat who led the kidnapping and carjacking of Victim C. Defendant admitted he was later in Victim C's stolen car, but concocted a story where the "real" kidnappers (Moran and two other unidentified individuals) handed him the keys to the car as he left a party at 5:30 a.m. that morning. Anania's story was not credible and the jury's verdict reflects their finding that the testimony was not credible.

### III.    Offense Calculation and Guidelines Range

A.    PSR Calculation of Offense Level

Pursuant to the 2024 Sentencing Guidelines Manual, the PSR calculates the total offense level as follows (PSR ¶¶38-72)[5]:

---

[5] The PSR does not take a position regarding whether the defendant obstructed justice due to perjury at trial.   The below calculation incorporates that defendant did obstruct justice

*Group 1 (Counts One and Two)*

| | |
|---|---|
| 32 | **Offense Base Level** pursuant to USSG § 2A4.1. |
| +3 | **Commission of Offense While on Release** pursuant to USSG § 3C1.3 |
| 35 | **Total for Group One** |

*Group 2 (Count Three)*

| | |
|---|---|
| 32 | **Offense Base Level** pursuant to USSG § 2A4.1. |
| +2 | **Dangerous Weapon Used** pursuant to USSG § 2A4.1(b)(3). |
| +6 | **Sexual Exploitation of Victim** pursuant to USSG § 2A4.1(b)(5) |
| +3 | **Commission of Offense While on Release** pursuant to USSG § 3C1.3 |
| +2 | **Obstruction of Justice** due to perjury at trial, pursuant to USSG § 3C1.1 |
| 45 | **Total for Group 2** |

*Group 3 (Counts Four and Five)*

| | |
|---|---|
| 32 | **Offense Base Level** pursuant to USSG § 2A4.1. |
| +2 | **Dangerous Weapon Used** pursuant to USSG § 2A4.1(b)(3). |
| +2 | **Reckless Endangerment During Flight** pursuant to USSG § 3C1.2 |
| +3 | **Commission of Offense While on Release** pursuant to USSG § 3C1.3 |
| +2 | **Obstruction of Justice** due to perjury at trial, pursuant to USSG § 3C1.1 |
| 41 | **Total for Group 3** |

*Grouping.* Group 2 receives 1 unit. Group 3 receives 1 unit since it is 4 levels less serious than Group 2. Group 1 receives no units because it is more than 9 units

with respect to Groups 2 and 3.

less serious than Group 3 (when an obstruction of justice enhancement is added to Group 3). The 2 units result in a 2 level increase from the Group 2 offense level, resulting in a total offense of 47.

The offense level is to be treated as 43 for the purpose of calculating the applicable Guideline Range, pursuant to Chapter 5, Part A, comment n.2.

B. <u>Criminal History</u>

Probation and the government agree that the defendant's criminal history score is 6 and his criminal history category is III. PSR at ¶87.

On or about February 15, 2022, defendant was convicted being a felon in possession of a firearm in the United States District Court for the Northern District of Illinois, and sentenced to 41 months of imprisonment. Pursuant to Guideline § 4A1.1(a), defendant receives 3 criminal history points for this conviction. PSR at ¶86.

On or about August 31, 2017, defendant was convicted of conspiracy to commit first degree murder in the Circuit Court of Cook County, Illinois, and sentenced to ten years of imprisonment. Pursuant to Guideline § 4A1.1(a), defendant receives 3 criminal history points for this conviction. PSR at ¶85.

On or about August 9, 2012, defendant was adjudicated delinquent on charges of aggravated battery in the Circuit Court of Cook County, Illinois, and sentenced to eleven months' imprisonment. Pursuant to Guideline § 4A1.2(d)(2), defendant receives no criminal history points for this conviction. PSR at ¶79.

C.    Advisory Guidelines Range

The government agrees with the PSR's calculation of the defendant's advisory guidelines range as being life imprisonment. PSR at ¶43.

Count Six carries a mandatory seven year consecutive sentence.

## IV.    The §3553(a) Factors Support Imposition of a Sentence of Life Imprisonment.

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[6] In order to determine the sentence to impose, the court must consider the statutory factors listed in §3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. §3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, the statutory sentencing factors reflect that a Guideline sentence of life imprisonment (with a consecutive sentence of seven years)

---

[6]Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

is warranted.

A.     Seriousness, Nature and Circumstances of Offense

The seriousness, nature and circumstances of the offense demonstrate that a Guidelines sentence of life imprisonment, and a consecutive sentence of seven years, is warranted.

Standing alone, the defendant's actions on March 8, 2021, from 6:14 p.m. to 6:47 p.m. were severe enough to warrant a Guidelines recommendation of life imprisonment. During that time period, the defendant, a convicted felon (for conspiracy of first-degree murder) on federal pretrial release, used a firearm to kidnap Victim B. During that time, he told her at gunpoint that he could make her do anything he wanted her to do, made it clear he knew her name and address, and molested her breasts and inner thigh. He forced her to rub his erect penis, to drive to a dark alley, to expose her breasts, and to perform oral sex. If the defendant had done nothing else, the Guidelines would have recognized this abominable conduct as constituting actions so violent and dangerous as to warrant an offense level of 43, and a sentence of life imprisonment, regardless of the defendant's criminal history. Everything defendant did beyond those actions merely corroborates the need for a sentence of life imprisonment in this case.

The reality is that conduct was only the start of defendant's victimization of Victim B. After leaving that first alley, defendant forced Victim B to drive to a second alley. In that alley, he vaginally raped Victim B at gunpoint, causing vaginal bruising and a tear in her hymen. He again forced her to again perform oral sex until he

ejaculated. In the aftermath, he unsuccessfully tried to destroy the evidence of his crimes, took steps to empty Victim B's bank account, and finally settled for the petty theft of whatever cash Victim B had available. Defendant fled Victim B's that night, but continued to victimize her from afar, poring over online pictures of her; researching her addresses, jobs and family members; and compiling notes on the same. Those notes appear tailor-made for a defendant seeking to intimidate a witness, although defendant was arrested before he was able to take any actions in relation to those notes.

Four years later, defendant continued his victimization of Victim B when he took the stand at trial. Defendant lied under oath, insultingly claiming Victim B had willingly agreed to do drugs and have consensual sex with a stranger minutes after they met. Defendant falsely claimed Victim B had committed perjury and concocted her entire story because the defendant failed to pay her $ 100.

The severity of defendant's actions are further compounded by the fact that Victim B was only one of three victims in this case, each of whom defendant inflicted with a lifetime of trauma.

Defendant, along with Moran, targeted Victim C as she walked out of her apartment, on her way to work. Defendant pointed a gun at Victim C's head, and he, along with Moran, forced their way into her car. Once they had control of the car, they didn't let her leave. They kidnapped her. They forced her to go with them for the next 45 minutes, terrifying her as they drove out to an empty forest preserve. They placed her life in danger when Moran engaged in a shoot-out during the kidnapping.

When she cried, defendant threatened to kill her. Defendant drove Victim C four blocks from where he had raped Victim B a day earlier and asked Moran what they were going to do with her. Although they released Victim B—at Moran's request—they stole her car, they stole her phone, and they stole the contents of her wallet. And as Victim C states in her statement to the Court, they stole her peace, her trust in others, her ability to live a normal life without fear.

When defendant encountered police an hour later, he ignored their attempts to pull over Victim C's car and led them on a high speed chase.

Defendant's first kidnapping occurred less than two weeks earlier, when he kidnapped Victim A as she approached her car. Defendant claimed he had a gun and forced his way into her car, where he molested Victim A's breasts and genitals and told her he was going to force her to "suck [his] dick." Victim A eventually realized defendant didn't have a gun and was able to successfully flee. Defendant then stole Victim A's car, which he crashed minutes later. Although Victim A's kidnapping was shorter than the other kidnappings, that does not mitigate the severity of defendant's kidnapping, molestation and carjacking of Victim A.

Defendant's apparent takeaway from the Victim A kidnapping was to arm himself with real firearms to intimidate his victims from escaping. Defendant, a convicted felon, used real guns, a Glock and a .357 snub-nose pistol during the course of his next two kidnappings. His use of those firearms considerably increased the danger posed to his victims, placing them in life-threatening danger throughout the kidnappings.

B.    History and Characteristics of Defendant

A sentence of life imprisonment is warranted and consistent with the history and characteristics of the defendant. Defendant receives criminal history points for his prior convictions for conspiracy to commit first degree murder (PSR ¶85) and being a felon in possession of a firearm (PSR ¶86). The resulting Criminal History Category of III understates defendant's criminal history, given the severity of the murder conspiracy conviction. However, that understatement is ultimately meaningless given that the Guidelines recognize the defendant's conduct as so severe that a sentence of life imprisonment is warranted regardless of defendant's criminal history.

The defendant admits that he was a member of the Latin Kings street gang. PSR ¶114. Defendant claims to have left the Latin Kings, which the government is unable to corroborate. Defendant claims that he left the Latin Kings in March 2021. But defendant kidnapped Victim C on March 10, 2021, with Moran, another member of the Latin Kings, and was arrested on March 13, 2021. Regardless of whether defendant has actually left the Latin Kings, his tattoos show his public devotion to the Latin Kings, including crowns on his left arm and leg, and two tattoos referencing the Boulevard 24 section of the Latin Kings, including one on his face.

C.    Sentencing Disparity

On April 22, 2025, the Court sentenced co-defendant Walter Moran to 188 months. With respect to the kidnapping of Victim C, Anania had a more serious role in the offense, as the offender who actually held a gun to Victim C's head and

threatened to kill her; as the offender who drove the car in which they held Victim C; and as the offender who led police on a high speed chase in Victim C's car.

Anania participated in three times as many kidnappings as Moran. Putting aside the quantity of kidnappings, the kidnappings for which Anania was solely responsible had additional severe elements not present in the kidnapping of Victim C. Anania sexually molested Victim A during the course of her kidnapping. Anania brought Victim B to two different alleys where he orally and vaginally penetrated her against her will. Anania then stalked Victim B online prior to his arrest.

Although Moran had a higher criminal history category than Anania, Anania had the most severe prior conviction, namely his conviction of conspiracy to commit murder.

Unlike Walter Moran, Anania was on federal pre-trial release at the time of the kidnappings.

Unlike Moran, who accepted responsibility for his actions, expressed remorse and plead guilty, Anania took his case to trial, where he perjured himself, at the expense of his victims.

D.    The Need to Protect the Public and Afford Adequate Deterrence and Respect for the Law

Anania has repeatedly shown that he will not be specifically deterred by the courts; that significant sentences will not prevent him from committing crimes; and that terms of court supervision or parole will not in any way curb his criminal behavior. In 2012 defendant was adjudicated delinquent of aggravated battery and received his first significant period of detention. He was released (March 2013), and

three months later he was returned to custody (June 2013). His probation ended (July 2013), and one year later he was arrested (August 2014) on charges including conspiracy to commit murder, for which he was eventually sentenced to the significant sentence of 10 years' imprisonment. He was released on parole (November 2018) and three months into that parole (February 2019), he was carrying a loaded semi-automatic pistol in the streets of Chicago, for which he was charged federally with being a felon in possession of a firearm. He was released on pretrial release (October 2020), and within five months had committed the three kidnapping in this case.

In the absence of specific deterrence, the government seeks a term of life imprisonment for the protection of the community. Over the past decade, defendants' victims have been robbed, carjacked, beaten, kidnapped, raped and murdered. The residents of the community must be protected from the defendant.

Although the defendant appears incapable of being specifically deterred, the Court can send a message of general deterrence with its sentence. Admittedly, the crimes at issue here are so egregious the public may not need the Court's sentence to affirm their severity. The Court can nonetheless make clear that the federal judiciary will not tolerate these violent crimes, and reinforce that there are some crimes that warrant a sentence of life imprisonment.

## V. SUPERVISED RELEASE

The government does not recommend that defendant be released from incarceration. In the event defendant is released, the government recommends that

24

the Court impose a period of 5 years of supervised release for Counts 1, 3, 4 and 6; and a period of 3 years for Counts 2 and 5, for a total of 26 years of supervised release. *See* PSR ¶ 147. The supervised release terms detailed in the PSR are narrowly tailored to facilitate supervision by the probation officer; and, to the extent possible, deter the defendant from future crimes, support defendant's rehabilitation and reintegration into the community, and ensure that he is engaged in lawful pursuits rather than criminal activity.

## VI. CONCLUSION

In view of the Section 3553(a) factors, a Guideline sentence of life imprisonment (and seven consecutive years) is fair, reasonable, and sufficient, but not greater than necessary. For these reasons, the government respectfully requests that this Court impose a Guidelines sentence.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:     */s/ Cornelius Vandenberg*
CORNELIUS A. VANDENBERG
HAYLEY ALTABEF
Assistant U.S. Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

Dated: April 28, 2025